EDWARD S. SMITH, Circuit Judge.
 

 This case presents the question whether a patentee is barred by the recapture rule from securing, through reissue, claims to subject matter previously canceled from the original application. Plaintiff-appellee, Ball Corporation (Ball), brought suit against the Government in the United States Court of Claims under 28 U.S.C. § 1498(a) (1976) for unauthorized use of the invention claimed in U.S. patent No. Re. 29,296 (July 5, 1977) to Krutsinger, et al. (the Krutsinger patent). The Government moved for summary judgment and Ball filed a cross-motion for summary judgment. Both motions were denied.
 
 [1]
 
 The Government appealed denial of its motion to this court. At the time of that first appeal, the judgment of the trial judge was not final and the issues had not been certified for appeal. In view of the uncertified, interlocutory nature of the appeal at that time, this court on March 30, 1983, issued an order dismissing the appeal for lack of jurisdiction with leave to seek certification and to appeal pursuant to 28 U.S.C. § 1292(d)(2). On November 22, 1983, the trial judge certified the questions. Permission was granted on December 12, 1983, to take interlocutory appeal to this court. The Government again appeals. We con-
 
 *1431
 
 elude that the trial judge properly denied the Government’s motion for summary judgment, and we remand the case for trial.
 

 Background
 

 The invention covered by the Krutsinger patent relates to a dual slot antenna assembly [10] (Fig. 1) intended for use on missiles.
 

 Fig. 1
 

 The antenna (Fig. 2) consists of two thin cylindrical concentric conductors [20, 24] assembled so that they are radially spaced slightly apart to form a cavity [18]. The cavity may be void or may be filled with a dielectric material. The axial length of the conductors is substantially equal to one-half wavelength at the anticipated operating frequency of the antenna. The conductor assembly can be mounted around the outer skin of the vehicle (Fig. 1).
 

 The circumferential edges of the cylindrical conductors define radiation slots [23, 25] (Fig. 3).
 

 Because the cylindrical conductors are one-half wavelength long, these radiation slots are, ipso facto, longitudinally spaced one-half wavelength apart at the anticipated operating frequency of the antenna. The radiation slots are excited by signal energy from a source and cooperate to produce an omnidirectional dipole radiation pattern.
 
 [2]
 
 Due to the one-half wavelength spacing between the radiation slots, the electromagnetic radiation emanating from the
 
 *1432
 
 slots [Ri, R2] radiates in the same direction and overlaps in an additive manner to provide a stronger radiation pattern.
 

 Signal energy is supplied to the antenna by a connector [70] (Fig. 4).
 

 Fig. 4
 

 In the preferred embodiment of the invention, the connection of the inner and outer cylindrical concentric conductive elements to the source is accomplished by means of a single coaxial transmission feedline. It is this feedline element around which the present controversy revolves. In particular, this case involves the number of feedlines to the outer conductor that may be properly claimed in the Krutsinger reissue patent in light of the prosecution history of the original patent application.
 

 The Canceled Claims
 

 Dependent claims 8 and 9 are the only claims of the original application critical to this appeal. Claim 8 includes the single feedline, whereas claim 9 does not. Claim 8 calls for “at least one” conductive lead to be connected to the edge of one of the conductors. Claim 9 requires that “a plurality of leads” be connected to the edge of one of the conductors at circumferentially spaced intervals.
 

 In the first office action on the original application the examiner rejected claims 1-8 and indicated that claims 9 and 10 should be limited to a plurality of feedlines. The claims were amended and, on July 14, 1972, the examiner made his second rejection final. The examiner again suggested the allowability of the plurality of feedlines claims if presented in independent form. The remaining claims were rejected over the newly cited reference, Cork, U.S. patent No. 2,234,234. The Cork patent discloses a single feedline [3] (Fig. 5) and is similar in all other material respects to Krutsinger’s antenna.
 

 Fig. 5
 

 Following the second office action, Ball added limitations to the claims requiring that a plurality of leads be connected to an edge of the outer conductor. These leads were recited to be spaced-apart at intervals substantially equal to one wavelength at the anticipated operating frequency of the antenna. Ball also canceled claim 7 and dependent claim 8 (the canceled claims), of the original application, which are set forth below:
 

 7. A dual slot antenna assembly comprising: a first substantially cylindrical conductor, the axial length of which is approximately equal to one-half wavelength at the anticipated operating frequency of said assembly; a second substantially cylindrical conductor, the axial length of which is at least equal to the axial length of said first conductor, said second conductor being positioned concentrically within and radially spaced from said first conductor so as to define a pair of circumferential slots spaced one-half wavelength apart at said anticipated operating frequency and providing independent radiation patterns emanating in the same direction; and electrical signal feed means connected with said
 
 *1433
 
 conductor for electrically exciting both of said slots.
 

 8. An assembly according to Claim 7 wherein said feed means includes at least one conductive lead which terminates connected to the edge of one of said conductors defining one of said slots.
 

 U.S. patent No. 3,810,183 (the original patent) issued on May 7, 1974, to Ball as assignee, on the basis of the original application, as amended.
 

 Subsequently, Ball decided that it was entitled to claims broad enough to include the single feedline. On July 16, 1975, within the 2-year statutory period for broadened reissue provided in 35 U.S.C. § 251, Ball filed a reissue application. Claims 1-4 of the reissue application comprised the four claims of the original patent. New claims 5-7 were added to the reissue application. Only the new claims, 5-7, directed to the single feedline embodiment, are in issue in this proceeding.
 
 [3]
 

 The Alleged Error
 

 In support of its reissue application Ball stated that the original patent was partially inoperative because it claimed less than Ball had a right to claim. Ball identified as error the undue limitation of the claims of the original patent to a plurality of feed-lines:
 

 [T]he unwarranted limited scope of our original patent claims were errors [sic] that arose without any deceptive intention as a result of inadequate and/or ineffective communication with our former patent attorney, * * * and/or as a result of an inadequate understanding on our part of the potential effect of recitations in the original patent claim language under United States laws; * * *
 
 [4]
 

 U.S. patent No. Re. 29,296 issued on July 5, 1977, on the basis of the reissue application.
 

 The Reissue Claims
 

 Ball filed an administrative claim with the United States Navy on January 18, 1978, seeking damages and compensation for unauthorized use of,
 
 inter alia,
 
 the invention covered by claims 5, 6, and 7 of U.S. patent No. Re. 29,296. Claims 5, 6, and 7 of the reissue patent are set forth below:
 

 5. A dual slot antenna assembly comprising:
 

 a pair of laterally spaced-apart conductive elements separated with respect to one another by a sheet of dielectric material,
 

 one of said conductive elements being of larger dimensions and underlying the other element and defining an electrical reference or ground surface;
 

 said conductive elements defining a pair of radiation slots between opposing edges of said other element and said reference surface, said radiation slots being longitudinally spaced-apart a predetermined distance approximately equal to one-half wavelength at the anticipated operating frequency of said assembly,
 

 each of which radiation slots emanates radiation therefrom such that the radiation patterns developed are in substantially the same direction;
 

 said radiation slots having a length dimension equal to the entire length of said opposing edges, which length dimension is greater than the spacing between said conductive elements; and
 

 a single electrical signal feed assembly integrally connected with said other conductive element at only one of said opposing edges for electrically exciting both of said radiation slots from a single signal feed junction.
 

 
 *1434
 

 6. An assembly according to claim 5 wherein said conductive elements and said sheet of dielectric material each comprise part of a single sheet of dielectric material metallically cladded on opposite sides thereof
 

 7. An antenna structure comprising:
 

 an electrically conducting ground surface,
 

 a single layer electrically conducting surface comprising both an r.f radiator conducting area and an r.f. feed-line conducting area integrally connected thereto and formed therewith,
 

 a dielectric sheet disposed between said ground surface and the single layer electrically conducting surface,
 

 said conducting surfaces defining a pair of radiation slots between opposing edges of said r.f. radiator and said ground surface, said radiation slots being longitudinally spaced apart by a predetermined distance approximately equal to one-half wavelength at the anticipated operating frequency of said antenna
 
 structure;
 

 each of which radiation slots emanates radiation therefrom such that radiation patterns developed are in substantially the same direction;
 

 said radiation slots having a length dimension equal to the entire length of said opposing edges, which length dimension is greater than the spacing between said surfaces; and
 

 said r.f. feedline being connected to the outside edge of one only of said opposing edges of said r.f. radiation conducting area to at least one predetermined point on the periphery of said radiator conducting area.
 
 [Emphasis in original.]
 

 On March 25,1981, Ball filed a petition in the United States Court of Claims under 28 U.S.C. § 1498 (1976),
 
 [5]
 
 seeking reasonable and entire compensation for the “infringement” of claims 5, 6, and 7 of U.S. patent No. Re. 29,296. On June 29, 1981, prior to filing an answer, the Government moved for summary judgment. Ball filed a cross-motion for summary judgment.
 

 Judge Colaianni denied both motions. As to the Government’s motion, denial of which is on appeal here, the trial judge found that the undisputed evidence of record did not support the Government's arguments; as to Ball’s cross-motion, the trial judge found that material issues of fact remained which compelled denial of the motion. Because we agree that neither the recapture rule nor the estoppel doctrine mandate grant of the Government’s summary judgment motion, we affirm.
 

 Issues
 

 Two issues are raised in this appeal: (1) whether the error alleged by Ball is sufficient as a matter of law under 35 U.S.C. § 251 (1976) to support reissue; and (2) whether Ball is estopped from securing, through reissue, claims covering the single feedline feature.
 

 The Government contends that Ball’s deliberate cancelation of the single feedline claims was not error. That act was taken to avoid a prior art rejection and, in the Government’s view, the recapture rule bars Ball from securing similar claims through reissue. The Government also contends
 
 *1435
 
 that the deliberate nature of Ball’s acts estops Ball from securing similar claims through reissue. Ball did not appeal the denial of its summary judgment motion but, rather, defends the trial judge’s opinion as correct as a matter of law. Resolution of this controversy involves a substantial body of precedent.
 
 [6]
 
 The parties differ in their interpretation of the law and in their application of it to the facts of this case.
 

 The Recapture Rule
 

 Reissue is not a substitute for Patent Office appeal procedures. Reissue is an extraordinary procedure and must be adequately supported by the circumstances detailed in 35 U.S.C. § 251 (1976)
 
 [7]
 
 and in the implementing regulations, 37 C.F.R. § 1.175 (1982). The Government asserts that the nature of error that will justify reissue is narrowly circumscribed to ensure that reissue remains the exception and not the rule. Relying on
 
 Edward Miller & Co. v. Bridgeport Brass Co.,
 

 [8]
 

 the Government contends that “a mere error of judgment” is not adequate to support reissue; rather the error must be “á real
 
 bona fide
 
 mistake, inadvertently committed.”
 

 The 1952 revision of the patent laws made no substantive change in the definition of error under section 251.
 
 [9]
 
 While deliberate cancellation of a claim cannot ordinarily be considered error,
 
 [10]
 
 the CCPA has repeatedly held that the deliberate cancellation of claims
 
 may
 
 constitute error, if it occurs without deceptive intent.
 
 [11]
 
 In
 
 In re Petrow,
 

 [12]
 

 the CCPA went so far as to state that error is sufficient where the deliberate cancellation of claims does not amount to an admission that the reissue claims were not patentable at the time the original claims were canceled. Similarly, in
 
 In re Wesseler,
 

 [13]
 

 the CCPA stated that error is established where there is no evidence that the appellant intentionally omitted or abandoned the claimed subject mat
 
 *1436
 
 ter. Thus, the CCPA has construed the term error under section 251 broadly.
 
 [14]
 

 The Ninth Circuit employed a more rigid standard in
 
 Riley v. Broadway-Hale Stores, Inc.
 

 [15]
 

 stating: “when the chief element added by reissue has been abandoned while seeking the original patent, the reissue is void.” The trial judge sought to determine whether Ball had made a deliberate judgment that claims of substantially the same scope as the new reissue claims would have been unpatentable. The Government, arguing from
 
 Riley,
 
 submits that the trial judge’s approach loses sight of the feature given up by a patentee in order to secure the original patent. We decline to adopt the rigid standard applied in
 
 Riley,
 
 in favor of the more liberal approach taken by the CCPA.
 
 Petrow
 
 clearly establishes the vitality of the standard employed by the trial judge under this court’s precedent.
 

 Further, the Government argues that we need not reach the issue of claim scope because the sufficiency of error is a threshold issue. While claim scope is no oracle on intent, the Government fails to apprehend its role. Rarely is evidence of the patentee’s intent in canceling a claim presented. Thus, the court may draw inferences from changes in claim scope when other reliable evidence of the patentee’s intent is not available. Claim scope is not the lodestar of reissue. Rather, the court’s reliance on that indicator in the case law appears to be born of practical necessity as the only available reliable evidence.
 

 The Government relies heavily on
 
 Haliczer v. United States,
 

 [16]
 

 which also involved a suit under 28 U.S.C. § 1498. The Court of Claims in that case held the reissue claims invalid because the patentee sought to acquire through reissue the
 
 same
 
 claims that had earlier been canceled from the original application. The recapture rule bars the patentee from acquiring, through reissue, claims that are of the
 
 same
 
 or of
 
 broader scope
 
 than those claims that were canceled from the original application.
 
 [17]
 
 On the other hand, the patentee is free to acquire, through reissue, claims that are
 
 narrower
 
 in scope than the canceled claims.
 
 [18]
 
 If the reissue claims are narrower than the canceled claims, yet broader than the original patent claims, reissue must be sought within 2 years after grant of the original patent.
 

 Thus, the applicability of the recapture rule and the sufficiency of error under section 251 turn in this case, in the absence of other evidence of the patentee’s intent, on the similarity between the reissue and the canceled claims. Narrower reissue claims are allowable; broader reissue claims or reissue claims of the same scope as the canceled claims are not.
 
 [19]
 
 The subject matter of the claims is not alone controlling.
 
 [20]
 
 Similarly, the focus is not, as the Government contends, on the specific limitations or on the elements of the claims but, rather, on the
 
 scope
 
 of the claims.
 
 [21]
 

 
 *1437
 

 Ball’s Reissue Claims
 

 The trial judge required the Government to establish that the applicant has made a deliberate decision that the canceled claims are unpatentable. The Government argues that that standard is not correct because it loses sight of the
 
 feature
 
 that the patentee gave up during prosecution of the original application. We find the Government’s argument entirely unpersuasive. The proper focus is on the
 
 scope
 
 of the claims, not on the individual
 
 feature
 
 or
 
 element
 
 purportedly given up during prosecution of the original application. The trial judge quite properly focused on the scope of the claims and we find no error in this respect. He determined that the reissue claims were intermediate in scope — broader than the claims of the original patent yet narrower than the canceled claims.
 

 The alleged inadequacy of Ball’s proffered error is not as clear as the Government contends. The error supporting reissue submitted by Ball comports with the statute and regulations. Further, we fail to perceive the “inconsistency” of Ball’s position as asserted by the Government.
 

 The canceled claims, claims 7 and 8,
 
 [22]
 
 define the invention quite broadly. Canceled claim 8 requires feed means including at least one conductive lead. The reissue claims,
 
 [23]
 
 in contrast, include limitations not present in the canceled claims: the cavity is filled with a dielectric material; and an electrical signal feed assembly replaces the feed means of the canceled claims. The electrical signal feed assembly (Fig. 6) is a network of leads with a single coaxial feed-line to that network. The network consists of a plurality of thin ribbon-like conductive leads.
 

 Feed points [53] to the outer conductor are one wavelength apart at the anticipated operating frequency of the antenna. The leads of this network [52, 54, 56, 58] are dimensioned to provide continuous impedance matching between the cavity and the single coaxial feedline [70], which feeds into the assembly at the aperture [48]. The signal feed assembly is more limited than the “at least one” feed means limitation of canceled claim 8.
 

 The reissue claims are, however, broader in one respect. The canceled claims are limited to an antenna of cylindrical configuration, whereas the reissue claims are not so limited. We are aware of the principle that a claim that is broader in any respect is considered to be broader
 
 *1438
 
 than the original claims even though it may be narrower in other respects.
 
 [24]
 
 That rule will not bar- Ball from securing the reissue claims here on appeal.
 

 Pursuant to section 251, broadened reissue must be sought within 2 years after issuance of the original patent. The CCPA, in
 
 In re Rogoff
 

 [25]
 

 noted that section 251
 

 contains no exceptions or qualifications as to time or extent of enlargement. The sole issue, therefore, is whether the claims on appeal enlarge, i.e., broaden, the patent claim.
 

 It is well settled that a claim is broadened, so far as the question of right to reissue is concerned, if it is so changed as to bring within its scope any structure which was not within the scope of the original claim. In other words, a claim is broadened if it is broader in any respect than the original claim, even though it may be narrowed in other respects. * *
 

 Thus, the principle that a claim is broadened if it is broader in any respect than the original claim serves to effect the bar of section 251 against reissue filed later than 2 years after issuance of the original patent. In this case, Ball filed its application for reissue within the 2-year period for broadened reissue specified in section 251.
 

 We know of no authority applying the above rule to reissue claims relative to the scope of canceled claims within the 2-year period for broadened reissue. Nor do we perceive the wisdom of such extension in this case. The rule is rigid and properly so in that it effects an express statutory limitation on broadened reissue. The recapture rule, however, is based on equitable principles. The rigidity of the broader-in-any-respect rule makes it inappropriate in the estoppel situation presented in this appeal.
 

 Hence, we decline to apply that rule here, where the broader feature relates to an aspect of the invention that is not material to the alleged error supporting reissue. In
 
 Willingham,
 
 the CCPA reversed the rejection of a claim that was narrower than the canceled claim as to one element, although broader as to another element. “The extent to which [deliberate cancellation of a claim from the original application] may also prevent [a patentee] from obtaining other claims differing in form or substance from that cancelled necessarily depends upon the facts in each case and particularly on the reasons for the cancellation.”
 
 [26]
 
 Accordingly, we hold that the reissue claims are not substantially identical in scope to the canceled claims.
 

 As noted
 
 supra,
 
 there is widespread agreement that reissue claims that are narrower than the canceled claims are allowable. In
 
 In re
 
 Wadlinger,
 
 [27]
 
 the CCPA faced a situation in which the reissue claims were, as the trial judge found here, of “different” scope from the canceled claims. While both the reissue and canceled claims were directed to the same process in
 
 Wad-linger,
 
 the canceled claims were considered broader, resulting in claims of different scope. The reissue claims were held valid. Similarly, we find that the non-material, broader aspects of Ball’s reissue claims do not deprive them of their fundamental narrowness of scope relative to the canceled claims. Thus, the reissue claims are sufficiently narrower than the canceled claims to avoid the effect of the recapture rule.
 

 
 *1439
 

 Estoppel
 

 The Government also argues that Ball is estopped to secure the reissue claims. We do not consider this argument as stating an independent ground for relief. The recapture rule is a creature of equity and it embodies the estoppel notions which the Government now urges upon us.
 
 [28]
 
 We have already resolved this issue against the Government.
 

 We agree with the patentee that the Government’s “file wrapper estoppel” argument is equally unavailing. The doctrine of estoppel based on the prosecution history is a corollary to the doctrine of equivalents, a tool in the analysis of infringement. The parties are before this court purely on a controlling issue of law relative to the validity of the reissue claims being asserted by Ball. There has not yet been a full trial on the issue of infringement, let alone on the validity of the reissue claims.
 
 [29]
 
 The Government’s estoppel argument does no more than restate the basic equitable principles underlying the recapture rule.
 

 Conclusion
 

 The trial judge properly articulated the law governing reissue. While broader in scope than the original claims, the reissue claims are narrower in scope than the canceled claims. The error supporting reissue appears to be sufficient. On the basis of the facts before us and the reasons given for the cancellation of the claims from the original application, we cannot find, as a matter of law, that Ball is barred from securing reissue claims drawn to the single feedline embodiment of its invention. The case is remanded to the Claims Court for further proceedings consistent with this opinion.
 

 AFFIRMED AND REMANDED.
 

 [1]
 

 . On October 8, 1982, pursuant to this court's order of October 4, 1982, Judge Colaianni of the U.S. Claims Court entered a judgment denying both parties’ motions for summary judgment, corresponding to his earlier report in the case, filed by him as a trial judge of the U.S. Court of Claims on August 23, 1982.
 

 [2]
 

 . Previous missile antennas exhibited signal nulls that made monitoring difficult from a ground tracking station as the missile rolled or changed direction in flight. The claimed antenna exhibits a substantially isotropic radiation pattern which overcomes this problem by eliminating signal nulls.
 

 [3]
 

 .
 
 See Haliczer v. United States,
 
 356 F.2d 541, 544-45, 148 USPQ 565, 568-69 (Ct.Cl.1966) (range of equivalents of original patent claims would not include canceled feature).
 

 [4]
 

 .
 
 See
 
 United States Patent and Trademark Office,
 
 Manual of Patent Examining Procedure
 
 § 1401.08 (1974) (error arising from a lack of understanding or of knowledge by applicant’s attorney as to the real invention may be acceptable).
 

 [5]
 

 . 28 U.S.C. § 1498 (1976),
 
 as amended by
 
 The Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 1982 U.S.CODE CONG. & AD.NEWS (96 Stat.) 25, provides, in pertinent part:
 

 "§ 1498. Patent and copyright cases
 

 "(a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner’s remedy shall be by action against the United States in the United States Claims Court for the recovery of his reasonable and entire compensation for such use and manufacture.
 

 "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.”
 

 [6]
 

 . The holdings of the U.S. Court of Claims and of the U.S. Court of Customs and Patent Appeals were adopted as precedent in this court in
 
 South Corp. v. United States,
 
 690 F.2d 1368, 1370, 215 USPQ 657, 658 (Fed.Cir.1982). Both prior courts have ruled on the issues involved in this case. Additionally, several circuit courts have also considered the application of the recapture rule.
 

 [7]
 

 . Section 251 provides in pertinent part:
 

 "§ 251. Reissue of defective patents
 

 "Whenever any patent is,
 
 through error without any deceptive intention,
 
 deemed wholly or partly inoperative or invalid, * * * by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. * * *
 

 ******
 

 "No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.” (Emphasis supplied.)
 

 [8]
 

 .
 
 Edward Miller & Co. v. Bridgeport Brass Co.,
 
 104 U.S. 350, 355, 26 L.Ed. 783 (1882).
 

 [9]
 

 .
 
 In re Wadlinger,
 
 496 F.2d 1200, 1206-07, 181 USPQ 826, 831-32 (Cust.Pat. & App.1974);
 
 In re Wesseler,
 
 367 F.2d 838, 849, 151 USPQ 339, 347 (Cust.Pat. & App.1966);
 
 In re Byers,
 
 230 F.2d 451, 454, 109 USPQ 53, 55 (Cust.Pat. & App. 1956);
 
 Riley v. Broadway-Hale Stores, Inc.,
 
 217 F.2d 530, 531 n. 1, 103 USPQ 414, 415 n. 1 (9th Cir.1954).
 
 But see In re Willingham,
 
 282 F.2d 353, 355, 127 USPQ 211, 214 (Cust.Pat. & App. 1960). “Error” is interpreted in the same manner as under section 64 of the old law,
 
 i.e.,
 
 accident, inadvertence, or mistake.
 

 [10]
 

 .
 
 In re Petrow,
 
 402 F.2d 485, 487, 159 USPQ 449, 450 (Cust.Pat. & App.1968);
 
 Willingham, 282
 
 F.2d at 357, 127 USPQ at 215.
 

 [11]
 

 .
 
 See Wadlinger,
 
 496 F.2d at 1206, 181 USPQ at 831;
 
 Petrow,
 
 402 F.2d at 487, 159 USPQ at 450;
 
 Wesseler,
 
 367 F.2d at 849, 151 USPQ at 348;
 
 Willingham, 282
 
 F.2d at 357, 127 USPQ at 215.
 
 See also Tee-Pak, Inc. v. St. Regis Paper Co.,
 
 491 F.2d 1193, 1201, 181 USPQ 75, 81 (6th Cir.1974);
 
 Manual of Patent Examining Procedure
 
 § 1401.-08.
 

 [12]
 

 .
 
 Petrow,
 
 402 F.2d at 488, 159 USPQ at 451.
 
 See also Wesseler,
 
 367 F.2d at 846, 151 USPQ at 344-46;
 
 Willingham, 282
 
 F.2d at 357, 127 USPQ at 215-16;
 
 Tee-Pak,
 
 491 F.2d at 1201, 181 USPQ at 81.
 

 [13]
 

 .
 
 Wesseler,
 
 367 F.2d at 850, 151 USPQ at 349.
 
 See also Riley,
 
 217 F.2d at 532, 103 USPQ at 415.
 

 [14]
 

 .
 
 Wadlinger,
 
 496 F.2d at 1207-08, 181 USPQ at 832;
 
 In re Rickman,
 
 409 F.2d 269, 273-75, 161 USPQ 359, 362-63 (CCPA 1969);
 
 Wesseler,
 
 367 F.2d at 849, 151 USPQ at 347-48;
 
 Willingham,
 
 282 F.2d at 355-56, 127 USPQ at 214.
 
 But see In re Wadsworth,
 
 107 F.2d 596, 43 USPQ 460 (CCPA 1939).
 

 [15]
 

 .
 
 Riley,
 
 217 F.2d at 532, 103 USPQ at 415.
 

 [16]
 

 .
 
 Haliczer,
 
 356 F.2d 541, 148 USPQ 565.
 

 [17]
 

 .
 
 Id.
 
 at 545, 148 USPQ at 569 (bars reissue claims of same scope);
 
 Byers,
 
 230 F.2d at 455-57, 109 USPQ at 56-57 (bars reissue claims that are of broader scope than canceled claims);
 
 Wadsworth,
 
 107 F.2d at 599, 43 USPQ at 463 (bars reissue claims of similar scope).
 

 [18]
 

 .
 
 Wadlinger,
 
 496 F.2d at 1204, 181 USPQ at 830;
 
 Petrow,
 
 402 F.2d at 488, 159 USPQ at 451;
 
 Wesseler,
 
 367 F.2d at 846-47, 151 USPQ at 346;
 
 Willingham,
 
 282 F.2d at 356, 127 USPQ at 215.
 

 [19]
 

 . If reissue is sought where claims have not been previously canceled, analysis becomes more difficult. In that case relative claim scope is not available to illuminate the alleged error. We are not faced with that situation in this proceeding.
 

 [20]
 

 .
 
 Petrow,
 
 402 F.2d at 488, 159 USPQ at 451.
 

 [21]
 

 .
 
 Richman,
 
 409 F.2d at 274-75, 161 USPQ at 362-63.
 
 See also Wadsworth,
 
 107 F.2d 596, 43 USPQ 460 (analysis turns on substantiality of similarity of reissue to canceled claims).
 

 [22]
 

 .
 
 See supra
 
 "The Canceled Claims.”
 

 [23]
 

 .
 
 See supra
 
 "The Reissue Claims."
 

 [24]
 

 .
 
 In re Self,
 
 671 F.2d 1344, 1346, 213 USPQ 1, 3 (Cust. & Pat.App.1982) (reissue application filed 7 years after issuance of original patent);
 
 In re Chromy,
 
 318 F.2d 937, 939, 137 USPQ 884, 885 (Cust. & Pat.App.1963) (4 years after issue);
 
 In re Price,
 
 302 F.2d 741, 741-42, 133 USPQ 527, 528 (Cust. & Pat.App.1962) (3 years after issue);
 
 In re Ruth,
 
 278 F.2d 729, 730, 126 USPQ 155, 156 (Cust. & Pat.App.1960) (4 years after issue).
 

 [25]
 

 .
 
 In re Rogoff,
 
 261 F.2d 601, 603-04, 120 USPQ 185, 186 (Cust. & Pat.App.1958).
 

 [26]
 

 .
 
 Willingham,
 
 282 F.2d at 357, 127 USPQ at 215.
 

 [27]
 

 .
 
 Wadlinger,
 
 496 F.2d at 1205-06, 181 USPQ at 830-31.
 

 [28]
 

 . Reissue is remedial in nature and is based on fundamental principles of equity and fairness. The recapture rule is inherently founded on similar considerations of equity, providing guidance in the application of the law governing reissue.
 
 See Wesseler,
 
 367 F.2d at 848, 151 USPQ at 347;
 
 Willingham,
 
 282 F.2d at 354-55, 127 USPQ at 214.
 

 [29]
 

 . The Government apparently misconstrues
 
 Haliczer
 
 in this respect. In
 
 Haliczer,
 
 the court determined that the doctrine of equivalents would require that the
 
 original
 
 claims, carried over into the reissue patent, would not be entitled to the range of equivalents that were purposely surrendered during prosecution of the
 
 original
 
 patent. This is based on an estoppel notion born of the inconsistency of arguing that the
 
 original
 
 claims cover that which was given up during the prosecution of the original patent. The
 
 reissue
 
 claims, not the original claims, are in issue here and the Government's reasoning is, therefore, inapposite. There is no inconsistency in arguing the broadened scope of the reissue claims and, thus, no estoppel.