59 F.3d 181
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 In re Robert M. HUNTER.
 Nos. 94-1301.
 United States Court of Appeals, Federal Circuit.
 June 19, 1995.
 
 Before RICH, MAYER, and MICHEL, Circuit Judges.
 RICH, Circuit Judge.
 
 DECISION
 
 1
 Robert M. Hunter (Hunter) appeals from the 28 February 1994 decision of the Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (board), appeal no. 94-0576, affirming the examiner's final rejection of claims 33-40 of application Serial No. 07/828,528 ('528 application), which is for a broadening reissue of U.S. Patent No. 4,896,542 ('542 patent). The claims stand rejected under 35 U.S.C. Sec. 112, first paragraph,[1] for lack of a written description that supports the rejected claims. We affirm.
 
 BACKGROUND
 
 2
 * The Invention
 
 
 3
 The '542 patent discloses an apparatus and method for metering the flow of a liquid, such as sewage, flowing under the force of gravity in an elongated pipe.
 
 
 4
 Figure 2 of the '542 patent, reproduced below, depicts an embodiment of the metering device. The device comprises an elongated cylindrical body having an entrance or upstream section 26 (see dashed lines) internally tapering to a constriction or "throat" 28, which then tapers outwardly to an exit or downstream section 30. As shown in Figure 5, also reproduced below, a person temporarily lowers the device into a sewer manhole and inserts it into the upstream section of a sewer pipe. Using instruments in the apparatus, one then takes flow measurements. For example, using differential pressure measurements, one may calculate the flow rate of liquid through the metering device.
 
 
 5
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 6
 The metering device functions as a modified venturi flume when the pipe is flowing less than full (open-channel condition) and as a venturi tube when the pipe is flowing full (surcharged condition). A venturi flume is a constriction in an open channel. When the flow reaches the constriction, it dips or "necks" down and assumes a depth that one may measure. One may then calculate therefrom the flow rate.
 
 
 7
 A venturi tube, on the other hand, is a constriction in a closed pipe. When the pipe is flowing full, the device works as a venturi tube because both the upstream section of the pipe and the throat are full. The apparatus is designed to provide accurate measurements under both full and less-than-full flow conditions. As the pipe becomes flooded (i.e., as the depth of flow rises to a point where the liquid fills the upstream section of the metering device), a transition period may occur. During this period, when the upstream section is filled with liquid but the throat is not, or vice versa, one may not obtain accurate flow rate measurements from the metering device. The transition period may last for a considerable length of time. The elimination or reduction of this transition period is an important objective of the claimed invention.
 
 II
 Prosecution History
 
 8
 Application Serial No. 286,695 ('695 application), on which the '542 patent issued, is the fourth application that Hunter filed in a family of patent applications. Hunter filed it on 20 December 1988 as a continuation-in-part (CIP) of the '325 application under 37 C.F.R. Sec. 1.53(b).[2]
 
 
 9
 On 29 January 1992, Hunter filed his '528 application, offering to surrender the '542 patent.[3] This application for reissue led to the instant appeal.
 
 
 10
 The following table summarizes this family of patent applications:
 
 
 11
 App'n Filing Patent No. Issue Comments
 S/N Date Date
364,192 03/31/82 --- --- the original app'n, now abandoned
846,516 03/31/86 --- --- FWC4 of the '192 app'n, now abandoned
051,325 05/19/87 4,799,388 01/24/89 CIP5 of the '516 app'n
286,695 12/20/88 4,896,542 01/30/90 CIP of the '325 app'n
828,528 01/29/92 --- --- i) app'n for reissue of the
 '542 patent; ii) the litigated app'n
 
 DISCUSSION
 
 12
 * Standard of Review
 
 
 13
 Our only task is to decide whether the PTO's rejection of reissue claims 33-40 under section 112, paragraph one, for lack of written description that supports the rejected claims, was proper. Compliance with section 112's written description requirement is a question of fact, reviewable under the clearly erroneous standard. See Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563, 19 USPQ2d 1111, 1116 (Fed. Cir. 1991) (citing In re Gosteli, 872 F.2d 1008, 1012, 10 USPQ2d 1614, 1618 (Fed. Cir. 1989); Utter v. Hiraga, 845 F.2d 993, 998, 6 USPQ2d 1709, 1714 (Fed. Cir. 1988)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 II
 The Claims
 
 14
 As the '528 reissue application comes to us, claims 1-28 and claims 30-32 stand allowed, Hunter has canceled claim 29, and the board has affirmed the examiner's final rejection of claims 33-40. The allowed claims contain the limitation that the entrance section and the throat section of the apparatus are required to fill substantially simultaneously. This is not the case, however, for the rejected claims.
 
 
 15
 Claims 33-40 include both apparatus and process claims that cover two basic embodiments. Claims 33-36 recite a process of metering the flow of liquid in an elongated pipe. Claims 37-40 recite an apparatus for metering the flow of the liquid in the pipe. Claims 33, 35, 37, and 39 state that the cross-sectional area of the throat is configured relative to that of the entrance so that the entrance section fills first when the liquid level rises and before the "modular limit" is reached. Hunter defines the "modular limit" as the maximum submergence of the device (i.e., the maximum ratio of downstream depth of flow to the upstream depth of flow). Claims 34, 36, 38, and 40 parallel claims 33, 35, 37, and 39; however, in these claims, the throat section fills first. Claims 33 and 37 typify the subject matter on appeal and read as follows (emphasis ours):
 
 
 16
 33. A process of metering the flow of liquid which is flowing in an elongated pipe that is open to the atmosphere, wherein a closed conduit venturi metering device is installed in the pipe, which device has an open-ended bore therethrough extending end-to-end thereof, the bore having an entrance section adjacent a first end thereof, an exit section adjacent the second end thereof, and intermediate the entrance and exist sections, a throat having a top and bottom and a smaller cross-sectional area than the entrance and exit sections, comprising the steps of:
 
 
 17
 arranging the device in the pipe to accept flow into the entrance from the pipe and otherwise to substantially block the pipe;
 
 
 18
 configuring the cross-sectional area of the throat relative to that of the entrance section so that the entrance section fills first on rising liquid level before the modular limit is reached;
 
 
 19
 providing means for determining the head of the liquid in said entrance section, in said throat and, [sic] in said exit section, for use at least to determine direction of flow in the device and flow both in less than full and in full flow through the device.
 
 
 20
 37. An apparatus for metering flow of liquid which is flowing in an elongated pipe which is open to the atmosphere, comprising:
 
 
 21
 a closed conduit venturi metering device installed in the pipe and having an open-ended bore therethrough extending end-to-end thereof, said bore having an entrance section adjacent a first end thereof, an exit section adjacent the second end thereof, and intermediate the entrance and exit sections, a throat having a top and bottom and a smaller cross-sectional area than the entrance and exit sections;
 
 
 22
 said device being arranged in said pipe to accept flow into said entrance from the pipe and otherwise to substantially block the pipe;
 
 
 23
 the cross-sectional area of the throat relative to that of the entrance section being configured so that the entrance will fill first on rising water level before the modular limit is reached;
 
 
 24
 means for determining the head of the liquid in said entrance section, in said throat, and in said exit section, for use at least to determine direction of flow in the device and flow both in less than full and in full flow through the device.
 
 
 25
 Before the board, Hunter stated that claims 33, 35, and 37 stand or fall together and that claims 34, 36, and 38 stand or fall together. Hunter also asserted that claims 39 and 40 were each separately patentable. The board disagreed with this latter assertion and found that Hunter's arguments did not distinguish claims 39 and 40 from claims 33-38. Hunter has not alleged any error in this board finding, and he has not argued for the separate patentability of claim 39 or 40 here. Further, each of rejected claims 33-40 contains the nonsimultaneous-fill limitation. Since the other limitations among rejected claims 33-40 do not affect the patentability of the claims as to the section 112, paragraph one, issue before us, all claims stand or fall together. Cf. In re Herbert, 461 F.2d 1390, 1391, 174 USPQ 259, 260 (CCPA 1972) (When additional limitations are irrelevant to the patentability of the claims, all claims will stand or fall together.).
 
 III
 The Reissue Proceeding
 
 26
 The reissue statute provides in pertinent part as follows:
 
 
 27
 Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.
 
 
 28
 ....
 
 
 29
 No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.
 
 
 30
 35 U.S.C. Sec. 251. "In enacting the statute, Congress provided a statutory basis for correction of 'error[.'] The statute is remedial in nature, based on fundamental principles of equity and fairness, and should be construed liberally." In re Weiler, 790 F.2d 1576, 1579, 229 USPQ 673, 675 (Fed. Cir. 1986) (citing In re Bennett, 766 F.2d 524, 528, 226 USPQ 413, 416 (Fed. Cir. 1985) (in banc); Ball Corp. v. United States, 729 F.2d 1429, 1439 n.28, 221 USPQ 289, 296 n.28 (Fed. Cir. 1984); In re Hay, 534 F.2d 917, 919, 189 USPQ 790, 791 (CCPA 1976)). "Nonetheless, not every event or circumstance that might be labeled 'error' is correctable by reissue." Id. In particular, a reissue applicant may not claim inventions discovered after filing the original patent application. A reissue application is limited to "the invention disclosed in the original patent." 35 U.S.C. Sec. 251.
 
 
 31
 In his reissue declaration, Hunter pointed out some minor errors in the specification and enumerated ten defects in claims 1 and 3 (the only independent claims) of the '542 patent. Hunter characterized the defects as unnecessary limitations. Some of these limitations required the entrance section to converge toward the axis of the throat in vertical planes paralleling that axis. Similar limitations defined the shape of the exit section. Of primary interest in the instant appeal is the "unnecessary limitation" referencing the measurement of flow during the transition from less-than-full-pipe to full-pipe flow. Of particular interest in the instant appeal is the allegedly "unnecessary limitation" requiring one to configure the cross-sectional area of the throat "so that the throat will fill with liquid substantially simultaneously with the upstream section of the pipe" when the liquid rises therein.
 
 
 32
 A reissue application, like any other application, must meet the written description requirement of section 112. See 35 U.S.C. Sec. 251 ("The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent ...." Id. p 3); see also In re Weiler, 790 F.2d at 1580, 229 USPQ at 675-76.
 
 IV
 
 33
 Section 112's Written Description Requirement
 
 
 34
 Section 112 requires a written description of the invention. This requirement is distinct from and not coterminous with the enablement requirement. "The purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention. The invention is, for purposes of the 'written description' inquiry, whatever is now claimed." Vas-Cath, 935 F.2d at 1563-64, 19 USPQ2d at 1117 (emphasis in original). Further, one must analyze each claim for compliance with the written description requirement. Id., 935 F.2d at 1567, 19 USPQ2d at 1120.
 
 
 35
 Although a specification that meets the written description requirement always satisfies the enablement requirement, the converse is not always true. The written description must "enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use" the claimed invention. 35 U.S.C. Sec. 112; see Kennecott Corp. v. Kyocera Int'l, Inc., 835 F.2d 1419, 1421, 5 USPQ2d 1194, 1197 (Fed. Cir. 1987) (written description must enable), cert. denied, 486 U.S. 1008 (1988). A patent specification, however, may fortuitously enable those of skill in the art to make and use an invention that an applicant did not make before filing the patent application. This latter application would satisfy the enablement requirement, but would not provide a section 112, first paragraph, "written description" adequate to support claims directed toward the later-made invention. See In re Barker, 559 F.2d 588, 591, 194 USPQ 470, 472 (CCPA 1977) (a specification may be sufficient to enable one skilled in the art to make and use the invention, but still fail to comply with the written description requirement), cert. denied, Barker v. Parker, 434 U.S. 1064 (1978); In re DiLeone, 436 F.2d 1404, 1405, 168 USPQ 592, 593 (CCPA 1971) ("[I]t is possible for a specification to enable the practice of an invention as broadly as it is claimed, and still not describe that invention.").
 
 
 36
 Depending upon the facts of each particular case, one may satisfy the written description requirement using, for example, drawings, tables, equations, and formulas, alone or in combination. See, e.g., Vas-Cath, 935 F.2d at 1564, 19 USPQ2d at 1117 (drawings alone may be sufficient); In re Wolfensperger, 302 F.2d 950, 955, 133 USPQ 537, 541-42 (CCPA 1962) (disclosure may be found in drawings).
 
 
 37
 As noted above, a reissue application must be for "the invention" disclosed in the patent offered for surrender--here, the '542 patent. Coupling this reissue requirement with the written description requirement, one must test the original application from which the patent offered for surrender in the reissue proceeding issued for compliance with section 112. Here, we must explore the '695 application as of its filing date.
 
 V
 The '695 Application and Section 112
 
 38
 In his brief, Hunter asserts that only his preferred embodiment eliminates the transition period with a throat designed so that the entrance section and the throat fill substantially simultaneously. He refers to claims 33-40, in which the throat and entrance sections are not required to fill simultaneously, as defining "non-preferred" or "less optimum" embodiments of his invention. In the '542 patent, however, Hunter's definition of the term "tubular venturi metering device" in the "Disclosure of the Invention" section fails to support this argument. In particular, that definition provides:
 
 
 39
 The term tubular venturi metering device also means an apparatus wherein the constriction is configured so as ... to cause the constriction to fill with liquid at approximately the same flow rate that the upstream pipe fills with liquid and thereby maintain its metering function during the transition from open channel to full pipe flow.
 
 
 40
 '542 patent, col. 3, 11. 4-12 (emphasis added).[6] He also characterized his invention at other points in the disclosure as including simultaneous filling.
 
 
 41
 In the '695 application, Hunter introduced the concept of a modular limit. As noted above, the modular limit is the meter's maximum submergence, or the maximum ratio of downstream depth of flow to upstream depth of flow. Operating below the modular limit provides at least two advantages: (1) measurements from the meter may be taken using only one differential pressure rather than two, thereby improving measurement accuracy; and (2) measurements from the meter can be taken without the need for correction curves. Hunter asserts that operation below the modular limit is a significant improvement regardless of whether the transition period is eliminated or merely reduced. This may be true. We are unconvinced, however, that his introduction of the modular limit concept alters the fact that one skilled in this art would conclude that, at the time he filed the '695 application, Hunter considered his invention to be simultaneous filling.
 
 
 42
 Hunter clearly considered simultaneous filling to be critical to his invention, and he clearly believed that his invention eliminated the "problem" created by nonsimultaneous filling. In fact, in his Reply Brief, Hunter "agrees that his disclosure teaches away from the non-preferred embodiments which fill nonsimultaneously." This teaching away and the lack of positive disclosure of nonsimultaneous filling support the board's position. We cannot comprehend how a specification can teach away from an embodiment and concomitantly convey that embodiment as the applicant's invention.
 
 
 43
 Hunter next asserts that the board erroneously held that he had not satisfied the written description requirement because he had not provided solutions to his equations for nonsimultaneous filing. In general, the descriptive effect of a disclosure is not limited to expressly identified solutions to disclosed equations or to preferred embodiments. There is no requirement for a verbatim description of every claimed embodiment. See, e.g., In re Edwards, 568 F.2d 1349, 1351-52, 196 USPQ 465, 467 (CCPA 1978) (citing In re Lukach, 442 F.2d 967, 169 USPQ 795 (CCPA 1971)). Thus, a solution to equations need not always be disclosed before one may properly claim an embodiment constrained or defined by the particular missing solution. When deciding, however, whether a disclosure satisfies the written description requirement with regard to a specific claim, it is proper to examine the application as a whole to decipher what it conveys to one of skilled in the pertinent art. It is indubitable that to properly claim subject matter that relies upon undisclosed solutions, those absent solutions must be obvious to one of ordinary skill in the pertinent art, and it must be apparent to these artisans that the inventor was in possession of the claimed subject matter at the time of filing the patent application.
 
 
 44
 In the instant case, the inclusion of solutions for nonsimultaneous-filling embodiments might have supported Hunter's otherwise unsupported argument that he was in possession of the nonsimultaneous filling embodiments of the rejected claims at the time he filed '695 application. Without the solutions and without any positive disclosure of nonsimultaneous filling, however, the tenor or "felt meaning"[7] of the specification is directed only toward simultaneous filling. Additionally, Hunter has not swayed us with his assertion that the PTO improperly limited him to his preferred embodiment or to the expressly identified solutions of the equations in the '695 application.
 
 
 45
 Hunter further argues that, even without the nonsimultaneous filling solutions, "the specification strongly suggests nonsimultaneous filling to those of ordinary skill by noting that filling may occur at 'approximately' the same rate." According to Hunter, "Like pregnancy, simultaneity is a binary-state proposition incapable of qualification by degree (i.e., events cannot be 'a little bit' simultaneous)." Although we agree with his characterization of pregnancy, we cannot adopt the child of his reasoning. Terms such as "approximately" and "substantially" in patent claims are terms of art that must be interpreted in light of the specification and prosecution history. Here, these modifiers "artificially" broaden the scope of the claims to include reality and add nothing to the claims. Accordingly, we find Hunter's argument unpersuasive.
 
 
 46
 Finally, Hunter argues that the written description inquiry must focus solely on the specification and cannot rely upon other documents. In particular, in one of its arguments, the PTO used quotes from Hunter's reissue declaration. The PTO argued that the quotes reveal Hunter's subjective understanding of his invention and bolster the examiner's assertion that Hunter did not consider his invention to embrace nonsimultaneous filling embodiments. Since our section 112 analysis does not rely on documents other than the '528 application and its ancestors, we do not find it necessary to address this argument.
 
 
 47
 In the reissue proceeding, Hunter asks that his disclosure be interpreted in a way that is contrary to its substance as filed. Hunter has failed to convince us that he was in possession of the invention he seeks to protect with rejected claims 33-40 of the '528 application at the time he filed the '695 application.
 
 VI
 Conclusion
 
 48
 For the reasons discussed above, we are not left with a definite and firm conviction that the board committed a mistake in sustaining the rejection of claims 33-40 of the '528 application under 35 U.S.C. Sec. 112, first paragraph, for lack of a written description that supports the rejected claims. Finding no reversible error in the board's decision, we affirm.
 
 
 
 [1]
 All United States Code citations are to the 1988 edition
 
 
 [2]
 All Code of Federal Regulations citations are to the 1994 edition
 
 
 [3]
 See 37 C.F.R. Secs. 1.171, 1.178 ("The application for a reissue must be accompanied by an offer to surrender the original patent.... If a reissue be refused, the original patent will be returned to applicant upon his request." Id. Sec. 1.178); see also 35 U.S.C. Sec. 252 ("The surrender of the original patent shall take effect upon the issue of the reissued patent ....")
 
 
 [4]
 File wrapper continuation (FWC) application under 37 C.F.R. Sec. 1.62
 
 
 [5]
 Continuation-in-part (CIP) application under 37 C.F.R. Sec. 1.53(b)
 
 
 [6]
 In the original '192 application, Hunter used the term "tubular venturi-type member" to describe his device, whereas in the '695 and '528 applications Hunter used the term "tubular venturi metering device." He has defined both of these terms, however, using the exact same language just quoted
 
 
 [7]
 Cf. United States v. Johnson, 221 U.S. 488, 496 (1911) (Holmes, J.) (discussing "felt meaning" of a claim)