Application of Robert L.
WADLINGER et al.
Patent Appeal No. 8997.

United States Court of Customs
and Patent Appeals.

May 23, 1974.

Richard K. Stevens, Arlington, Va., attorney of record, for appellants. O. G. Hayes and R. W. Barclay, New York City, of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Robert D. Edmonds, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 16, 17, and 19 of application serial No. 806,753, filed March 4, 1969, for reissue of patent No. 3,308,069, granted March 7, 1967, for "Catalytic Composition of a Crystalline Zeolite." We reverse.

### The Invention

The invention relates to synthetic zeolites, methods of making them, and hydrocarbon cracking conversion processes using them as catalysts. Appellants' application includes claims drawn to zeolite compositions represented by the following patent claim allowed in this reissue application:

2. A crystalline synthetic catalyst material having the composition:

$$\left[ \frac{X}{n} M(1 \pm 0.1 - X)H \right] AlO_2 YSiO_2 WH_2O$$

where X is less than 1, Y is greater than 5 but less than 100, W is up to about 4, M is a metal, and n is the valence of M, said material being characterized by an X-ray powder diffraction pattern essentially the same as that shown in Table 4.

The application refers to this composition as "zeolite beta" and so will we.

Appellants' original application for the patent they seek to reissue contained claims drawn to zeolite beta, methods of preparing the zeolite, and, as will later be explained in more detail, catalytic conversion of hydrocarbons utilizing the zeolite compositions. The claims to the zeolite and the methods of making it were allowed in the original application and are reallowed here, appearing as claims 1 through 14 in the reissue application. The issue here involves process claims to the use of zeolite beta as a catalyst for the cracking of hydrocarbons. Claim 19 reads:

19. In a process for conducting in the presence of a solid porous catalyst an isomerization, disproportionation, polymerization, or alkylation hydrocarbon conversion reaction characterized by a heat of reaction not less than zero, the improvement which comprises contacting charge hydrocarbons for said reaction at conversion conditions with a crystalline aluminosilicate catalyst at least partially in the hydrogen form resulting from treatment of the zeolite defined in claim 2 with a fluid medium containing ions selected from the class consisting of hydrogen ions and ammonium ions.

Claims 16 and 17 read:

16. The process of claim 19 wherein said fluid treating medium also contains metal cations.

17. The process of claim 19 wherein at least a portion of the ammonium ions in said treating medium are complex ammonium ions.

### The Relevant Prosecution History of the Original Application

The original application was aptly characterized by the board as containing, in addition to the composition and

method-of-making claims, claims which are generic to all catalytic conversions with the novel zeolite, as well as claims directed to three specific types of conversion reactions: polymerization, alkylation, and isomerization. The method-of-use claims were rejected by the examiner in the original application "as the obvious use of the claimed crystalline zeolite," since "Plank et al. (II)[1] discloses the claimed use of a similar crystalline zeolite as a catalyst for the conversion of hydrocarbons. In their second response appellants stated:

> Applicants do not agree with the Examiners that the claims to the use of this novel catalyst are obvious in view of the prior art; however, in order to expedite issuance of this application but without setting a precedent on this point for future cases, applicants have cancelled claims 15–25 [the method-of-use claims] without prejudice in favor of the allowed claims.

### The Basis for Reissue

Appellants base their claim for reissue under 35 U.S.C. § 251, as stated in the oath of the reissue application, upon the fact that

> * * * during the prosecution of the application, applicants did not understand all of the inherent characteristics of the claimed compositions, more particularly that certain of these compositions exhibited unique properties when used as catalysts in a selected class of catalytic hydrocarbon con-

version reactions as recited in [the] claims * * * and it was not until after the patent issued that it was realized that claims of the scope of [these] claims * * * should have been included in this application based on the disclosure therein.

Thus, appellants' argument is that, under the law which governed the prosecution of their original application, appellants understood that the patentability of their method-of-use claims was determined by whether appellants could show the existence of unexpected or superior results in the use of the composition; and appellants, being unable to show such superior results, cancelled the claims directed to the use of the zeolite in the original application. Appellants filed the reissue application, however, because of their knowledge of what appeared to them to be unique superior properties of zeolite beta as a catalyst for cracking hydrocarbons, properties which they refer to as "inherent characteristics" of zeolite beta.[2]

### The Rejections

As noted by the board, the claims on appeal stand rejected on two grounds:

> (1) The claims are improper reissue claims under 35 U.S.C. § 251 because appellants' deliberate cancellation of claims similar in scope in the original case does not involve error within the meaning of the statute; and

---

1. U. S. Patent No. 3,140,253, issued July 7, 1964.

2. Much was made at oral argument of the fact that appellants may not have discovered the superior results of the use of zeolite beta *until after issuance* of the original patent. See Reeves Brothers, Inc. v. U. S. Laminating Corp., 282 F.Supp. 118 (D.C. 1968), and Ex parte Ziherl, 116 USPQ 162 (Pat.Off.Bd.Appls.1957). The record before this court dealing with the question is scanty. The reissue oath, as already noted, said only that appellants "did not understand all of the inherent characteristics of the claimed compositions" during the prosecution of the original application. At oral argu-

ment appellants' attorney again spoke of the properties of the zeolite as "inherent" but noted that appellants "learned of the great value (of the zeolite catalyst) after the patent actually issued." This latter discovery was, in the view of appellants' attorney "a favorable thing because we [appellants] could not have inserted this specific claim before the patent issued."

We have studied the opinion of the board and have concluded that alleged *later discovery* of the superior performance of zeolite beta was not treated by the board as a reason for finding lack of "error" within the meaning of § 251. Accordingly, we do not deal with it here.

(2) The claimed process is unpatentable under 35 U.S.C. § 103 as being the obvious use of the claimed zeolite, with the Plank et al. patents being referred to in support of this rejection.

## OPINION

### The Obviousness Issue

Taking the second issue first, the board agreed with the examiner that the method-of-use claims were "directed to an obvious use of the claimed aluminosilicate" in view of two patents to Plank et al.[3] The position of the examiner was, first, that in view of the Plank patents "one of ordinary skill in this art would conclude that the crystalline aluminosilicate zeolites * * * would also be useful as catalysts for hydrocarbon conversion reactions," and, secondly, the affidavit submitted did not establish the existence of unexpected results in the use of the zeolite in all of the four reactions claimed. The board agreed with both rationales. Dealing with the test for determining the obviousness of the method-of-use claims, the board further expressed agreement with the examiner that the case was controlled by a Board of Appeals decision, Ex parte Kuehl, which, although unpublished, involved an application assigned to the same corporation as the application on appeal here. That decision of the board was reversed by this court last term. In re Kuehl, 475 F.2d 658 (Cust. & Pat.App.1973).

In *Kuehl*, where the facts were very similar to those here, we unanimously agreed that 35 U.S.C. § 103 requires that the obviousness of a method-of-use invention is not to be determined by asking, as the board did here, whether "one of ordinary skill in this art would conclude that the crystalline aluminosilicate zeolites described and claimed herein would also be useful as catalysts for hydrocarbon conversion reactions." Utilizing the very language of our opinion in *Kuehl*, we find the proper application of the statutory test of § 103, as enunciated by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and the reasons why the examiner and the board erred here, to be as follows (emphasis added):

The issue here concerns primarily the meaning of the terms "prior art" and "subject matter as a whole" in § 103, and specifically *whether appellant's zeolite composition is in any way to be considered as "prior art" for the purposes of applying the statute.* Appellant says that the board's decision holding the claims to the method of using the zeolite obvious in view of * * * [the Plank patents] "necessarily utilizes as 'prior art' appellant's own disclosure" of the zeolite. To the extent that the board may have affirmed the examiner's view that the process claims represented "obvious use of the * * * catalyst for the conversion of hydrocarbons," this appears to be the case. The examiner's language does appear to treat incorrectly the * * * zeolite as part of the prior art. The correct application of the test of § 103 requires that the claims on appeal not be judged against any prior art other than * * * [the Plank patents].

■■ We hold that the claims directed to the use of zeolite beta as a catalyst for the four hydrocarbon conversion reactions recited therein are unobvious from the two Plank references. While the Plank references describe, as noted by the board, "a considerable variety of known aluminosilicate zeolites and disclose their utility for hydrocarbon conversion reactions," including those *reactions* recited in the appealed claims, the references nowhere disclose zeolite beta. And, as we said in *Kuehl*, "the process 'invention as a whole' includes the use of the * * * zeolite and one having no knowledge thereof would not find it obvious to crack hydrocarbons using it as a catalyst." Judging the obviousness under § 103 of the method-of-use claims in similar fashion here, we conclude that they define an unobvious contribution to

3. Nos. 3,140,251 and 3,140,253, issued July 7, 1964.

the art of converting hydrocarbons. See In re Schneider, 481 F.2d 1350, 1356 (Cust. & Pat.App.1973). Accordingly, the rejection under § 103 is reversed.

### The Reissue Question

The second basis for the denial of claims to the methods of use of zeolite beta is that they are improper claims for reissue under 35 U.S.C. § 251 because appellants deliberately cancelled claims of similar scope in the prosecution of their original patent, wherefore there is no "error without any deceptive intention," within the meaning of § 251.[4]

The original application contained claims which were directed broadly to "catalytic conversion of hydrocarbons" and also claims which were directed to three specific types of such reactions, including in particular "alkylation," "isomerization," and "polymerization." As previously noted, all such method claims were cancelled from the original application.

The main thrust of the examiner's rejection and the board opinion is to be found in the following quotation from the Examiner's Answer:

Claims 16, 17 and 19 stand rejected as improper claims in this reissue. Claims of similar scope were deliberately cancelled by appellants' in the parent case thereby estopping appellants' [sic] from asserting error or inadvertence in applying for a reissue as required by 35 U.S.C. § 251. It is an established principle of law that the "deliberate withdrawal of rejected claim(s) in order to obtain (a) patent does not involve inadvertence or error justifying reissue of (a) patent; thus, claim(s) of reissue application (are) rejected where (they are) *similar in scope* to cancelled original claim(s), ["] (emphasis added). Nicherson [sic] v. Bearfoot Sole Co., Inc., (CA 6) [311 F.2d 858] 136 U.S. P.Q. 96[5] *accord,* McCullough Tool Co. v. Well Surveys Inc. (CA 10) [343 F. 2d 381] 145 U.S.P.Q. 6; In re Handel [312 F.2d 943, 50 CCPA 918] (CCPA) 136 U.S.P.Q. 460; Haliczer v. United States [356 F.2d 541, 174 Ct.Cl. 507] (U.S.Ct.Cls.) 148 U.S.P.Q. 565.

Appellants do not quarrel with the legal basis for the rejection of reissue claims under § 251 where claims "similar in scope" have been cancelled in the prosecution of the original application, but contend that the claims which were cancelled in their original application were not similar in scope to the claims on appeal, relying for authority upon three decisions by this court, In re Willingham, 282 F.2d 353, 48 CCPA 727 (1960); In re Wesseler, 367 F.2d 838, 54 CCPA 735 (1966); and In re Petrow, 402 F.2d 485, 56 CCPA 710 (1968), which broadly support the proposition that claims of a scope narrower than claims cancelled from the original application may be obtained by reissue.

The board apparently agreed with the above proposition of law, but distinguished the cases on the ground that here "the rejected claims are of substantially the same scope as those cancelled from the original application." Most of the board's opinion on this point is dis-

---

4. § 251. *Reissue of defective patents* [First para. only]

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

5. The examiner was fleshing out USPQ headnote 3 in the *Nickerson* case by his parenthetical additions. The headnoted text was a quotation from the examiner raising a question left undecided by the court, which held the claims sued on "invalid for want of invention."

cussion of the fact that, with respect to the four specific hydrocarbon conversion *reactions* claimed in the reissue application, "no single original claim is directed to the exact grouping which is now claimed" in what the board referred to as a "Markush-type grouping."

As noted earlier, the original application contained claims broadly drawn to the "catalytic conversion of hydrocarbons," which claims the board considered to be "generic to *all* catalytic conversons with the novel zeolite," including the four conversions claimed in the reissue application, and also contained claims specific to three of the four conversion reactions claimed in the appealed claims, namely, isomerization, polymerization, and alkylation, to which the appealed claims add disproportionation. The board did not feel that these differences in the *form* of claiming—i.e., specific claims vs. a Markush grouping—mitigated against the claims being held to be of "substantially the same scope" for application of the rule against "recapture" by reissue of previously cancelled claims.

Appellants' second reason why there is a lack of similarity in scope between the cancelled claims and the appealed claims relates to the *form of the zeolite* which is used in the method of the appealed claims. Appellants' brief explains their argument:

All of the claims, both those rejected and those cancelled, relate to the type of zeolite of claim 2, however, the specification indicates that the zeolites of claim 2 may be used as is or

"catalytic materials can be prepared by calcining the original sodium form zeolite beta and/or by replacing the major portion of the sodium in the zeolite with other metallic and/or ammoniacal ions. If the calcination is carried out prior to ion exchange, some or all of the resulting hydrogen ions can be replaced by metal ions in the ion exchange process." (See specification, col. 5, lines 17–23).

\* \* \* \* \* \*

The rejected claim 19 on the other hand [unlike the cancelled claims] relates to using the zeolite of claim 2 which has been treated with a fluid medium containing hydrogen or ammonium ions. Rejected claim 16 relates to using a zeolite of claim 2 which has been treated with a fluid medium containing hydrogen or ammonium ions and further containing metal ions. The rejected claim 17 relates to using a zeolite of claim 2 which has been treated with a fluid medium containing ammonium ions, at least a portion of which are complex ammonium ions.

Thus, it is clear that *the rejected claims are referring to a different catalyst than were [sic] claimed in cancelled claims of the original application.*

The board's view on appellants' argument relating to a difference in the claimed form of the zeolite was that the appealed claims were still of substantially the same scope as the cancelled claims. The board said:

Original claim 15 shows the zeolite containing hydrogen and metal ions, and original claim 16 shows the zeolite containing complex ammonium and metal ions. The further limitation that the aluminosilicate catalyst at least partially in the hydrogen form results "from treatment of the zeolite defined in claim 2 with a fluid medium containing ions selected from the class consisting of hydrogen and ammonium ions" does not substantially change the scope of the claim because this is but the conventional manner of treating the zeolites.

Appellants respond to the board's argument by noting, correctly we think, that the specification shows that the catalysts of claim 2 already are at least partially in the hydrogen form, and further, that treatment may be by *either* calcining or ion exchange, whereas the appealed claims specifically recite only the catalyst resulting from treatment of the zeolite with a fluid medium containing hydrogen or ammonium ions. It is

apparent, therefore, that there is indeed a difference in claim scope, at least with respect to the form of the zeolite catalyst, between the invention now claimed and the invention covered by the cancelled claims. It remains to determine whether such a difference is sufficient to satisfy the requirements of § 251 as construed by the courts.

A basic statement of the law was made by us in In re Willingham, supra, 282 F.2d at 357, 48 CCPA at 733 where we said:

> The deliberate cancellation of a claim of an original application in order to secure a patent cannot ordinarily be said to be an "error" and will in most cases prevent the applicant from obtaining the cancelled claim by reissue. The extent to which it may also prevent him from obtaining other claims differing in form or substance from that cancelled necessarily depends upon the facts in each case and particularly on the reasons for the cancellation.

The question here, then, is whether the difference is one "in form or substance" which, as a matter of law, will justify the allowance of the appealed claims. We believe that it is, under prior decisions of this court.

■ In re Petrow, supra, dealt with a very similar argument. The appellants there maintained that "the controlling feature in the present case is the fact that applicants are not attempting to recapture the same or an immaterially different claim from that cancelled * * *." In that case the applicants, during prosecution of their original application, abandoned claim 4 directed to a compound of betaine and chloral and sought through reissue to claim the identical compound in claim 10, which, however, in addition to the limitations of the cancelled claim, described the compound in more detail by reciting more of its inherent properties. Responding to the argument that under Willingham there could be no "error" justifying reissue of the patent under

these circumstances, we said, 402 F.2d at 488, 56 CCPA at 713:

> We feel that the fact that claim 10 recites more inherent properties of the disclosed compound than does claim 4, so as to more fairly "fingerprint" it, results, under the circumstances shown, in a claim differing in form, as contemplated by the language quoted from In re Willingham, supra, as well as presenting a claim having a different scope of legal protection. While claim 10 may be directed to the same subject matter, that is, the disclosed invention, it does not necessarily follow that the scope of legal protection afforded it is the same as that of claim 4.

We think similar considerations govern the result here. While both the cancelled claims and the appealed claims may be *directed* to the same process, the scope of the cancelled claims was indeed broader than the scope of the appealed claims which, in more fairly fingerprinting the processes, results in claims which differ from the cancelled claims in the scope of legal protection afforded. Accordingly, we do not agree with the board that there can be no "error" within the meaning of § 251.

It is noted that part of appellants' argument has centered on In re Wesseler, 367 F.2d 838, 54 CCPA 735 (1966), where this court cast considerable doubt on the correctness of its prior statement in In re Byers, 230 F.2d 451, 454, 43 CCPA 803, 805 (1956), which reads:

> The use of the word "error" in that sentence [of 35 USC 251] instead of the words "inadvertence, accident or mistake," which appeared in the corresponding section (35 U.S.C. § 64, Section 4916 R.S.) of the patent statutes prior to the recodification of 1952, does not involve a substantive change, and the same type of error is necessary to justify a reissue after the enactment of the Patent Act of 1952 as before * * *.

Appellant says of *Wesseler,*

> According to this case, the error must occur only *without deceptive intention* and not through inadvertence accident or mistake as required by the old statute and In re Byers which is relied upon by the Examiner. Based upon this case, reliance upon In re Byers is of doubtful validity. The In re Wesseler case was decided some 10 years later than In re Byers and notes that there is no authority cited in the In re Byers case for the proposition that the old and new patent statutes contemplated the same type of error in 35 U.S.C. 251.

In addition, in *Wesseler* we did state that the court in *Byers* "ignored the *fact* that the new reissue statute broadened the term 'error' by not limiting it to 'error' that had arisen through 'inadvertence, accident or mistake'."[6]

■ Appellants' argument has led us to review the legislative history of § 251 and the basis for our statement in *Wesseler.* We now conclude that in *Byers* this court was correct in noting that the substitution of "error" in § 251 for "inadvertence, accident, of mistake" did not involve a substantive change. See Federico, "Commentary on the New Patent Act," 35 U.S.C.A. p. 43. We would be hard-pressed to think of examples of situations which would be "error" and not be encompassed by one or the other of "inadvertence, accident, or mistake." "Inadvertence" and "accident" may imply something other than deliberate action, but "mistake" has a broad sweep and is certainly inclusive of actions taken in full consciousness. In Tee-Pak v. St. Regis, cited in note 6, supra, the Court of Appeals said, "a deliberate and intentional amendment to a claim may be error without deceptive intention." The primary definition of "mistake" is "to choose wrongly" (Webster's Seventh New Collegiate Dictionary).[7] This court, in its decisions both before and after *Wesseler,* has made it clear that a reissue applicant is, at most, prevented by interpretations of the language of § 251, and its predecessor statute R.S. 4916, from obtaining claims which are of the same scope as the claims previously cancelled in the original application. As for obtaining claims on reissue which are different, no prohibition arises merely because of the language of the reissue statute. Still apropos and basic is our statement in *Wesseler*:

> We think the term "error," arising as it does in a remedial provision designed to advance both the rights of the public and the inventor, is to be interpreted as Congress has stated it, "error without any deceptive intention," and in light of Supreme Court decisions favoring the liberal construction of reissue statutes in order

---

6. Recently, the accuracy of these statements in *Wesseler* was challenged by the District Court opinion in St. Regis Paper Co. v. Tee-Pak, Inc., 352 F.Supp. 309 (N.D.Ohio 1973), rev'd 491 F.2d 1193 (6th Cir. 1974). See discussion in Pat. Law Perspectives, Dev. A.8[1]–19, Rel. No. 4/1973.

7. It is unnecessary in this case to go into the meanings of the old and new reissue statutes exhaustively. However, we deem it instructive to note the following definition from Webster's New International Dictionary (2d Ed. 1937) :

> *mistake* n. * * * 2. *Law.* Misconception or error of the mind leading a person to do an act which he otherwise would not have done; also the act or omission so arising, as an intentional act or omission arising from ignorance, surprise, imposition, or misplaced confidence.

Adopting such a definition of "mistake," it seems altogether superfluous to argue that "error without deceptive intention" is substantively broader than "error [which] has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention," which is the old statutory language. In the absence of any revealing legislative history, probably the best that can be said is that the 1952 Act is a recodification of the old statute in more concise, modern statutory form, *omitting unnecessary words.* That would conform to the writer's personal recollection, as one of the drafters of the section, of what they intended to do. What we now feel is that this language of the former statute is quite as broad as the language of § 251 which replaced it, notwithstanding some cases which construed it narrowly.

to secure to inventors protection for what they have actually invented.

See In re Richman, 409 F.2d 269, 56 CCPA 1083 (1969), holding there was "error without any deceptive intention" under § 251 where the reissue claims differed in scope from cancelled claims and also found, as in *Wesseler*, that "while appellant *acted* 'deliberately', he did so in error."

### Appellants' Unexpected Results

Part of the basis for the board's affirmance of the examiner's rejection's under both sections 103 and 251 is an alleged insufficiency of appellants' showing of unexpected results of the use of their zeolite in the four hydrocarbon reactions claimed. The board found that "Even assuming that appellants have established unexpected results for isomerization it is clear that there is no sufficient showing as to disproportionation, polymerization, and alkylation." Since each member of the Markush-type grouping of reactions of the appealed claims "must be allowable individually or the whole group fails," the board, applying the law as it was before our decision in *Kuehl*, found the invention obvious under § 103 and, in addition, found no "error" under § 251.

■ As respects § 103, there is no question but that the change in the law brought about by *Kuehl*, particularly in its overruling of In re Saunders, 154 F. 2d 693, 33 CCPA 1001 (1946), means that in applying the standards of § 103 to the appealed claims we need not consider whether appellants have established unexpected superior results in the use of zeolite beta because under *Kuehl* they need not show such results.

With respect to the question whether there was "error" within § 251, it is not so clear whether the unexpectedness of appellants' results must be examined. Part of the rationale of the board for the rejection under § 251, in addition to the estoppel rationale dealt with earlier, was that appellants committed no "error" by not originally pursuing the method-of-use claims since, in fact, they had no unexpected results and thus were never entitled to method-of-claims in the first place.

■■ The parties' briefs have not dealt with the pertinent question but we have nevertheless felt obliged to deal with the matter and have concluded that since on the § 103 issue appellants would not today, after *Kuehl*, have to show unexpected properties, there is no basis for requiring such a showing to establish "error" within § 251. It is clear that the patentability of reissue claims is determined by application of the law which exists during the prosecution of the reissue application rather than the law at the date of issuance of the original patent, where there has been a change since then. In Rohm & Haas Co. v. Roberts Chemicals, Inc., 245 F.2d 693 (4th Cir. 1957), the court considered the validity of a reissue patent applied for more than nine years after the original patent issued to add process claims. The court noted two specific provisions of the 1952 Patent Act which were new and that the patentee's belated reissue application was to take advantage of these new provisions when he "made application for the process claims on October 24, 1952, shortly after the passage of the statute." The court said: "The reissued patent was granted on November 24, 1953, after the effective date of the statute, and we think that the validity of the reissue should be construed in light of its provisions."

■ Similarly in point is Ashley v. Samuel C. Tatum Co., 240 F. 979 (S.D. N.Y.1917), an infringement case upholding the validity of the first design patent ever reissued. The original patent had been obtained when the rules of the Patent Office did not permit a written description of a design in the patent, but only a drawing. The patentee had brought a prior suit on the original patent, which was held valid but not infringed because the alleged infringement, though embodying the patented design, was sufficiently ornamented so as not to resemble the patent drawing. The court noted, however, that the pat-

entee may well have been entitled to more broadly claim the dominant feature of his invention, with or without ornamentation, but had "no such claim, and no written description upon which it could be based * * * possibly solely because the Patent Office refused to allow any written description to be filed * * *." Later, however, the Patent Office rule was changed to provide for a written description in a design patent, and the patentee sought reissue of his patent to add a description of his design and to claim it, not just "as shown," but "as shown and described." He obtained the reissue patent and then sued the original defendant for its infringement. The court upheld the validity of the reissue patent obtained to take advantage of the change in the Patent Office rules and noted the defendant's infringement, but it refused to allow recovery against that defendant because of its intervening rights. See also Moist Cold Refrigerator Co. v. Lou Johnson Co., 217 F.2d 39 (9th Cir. 1954). Accordingly, we see no basis for holding appellants to the case law which may have existed at the time of their original patent and believe that their reissue application may benefit from the change in the law brought about by In re Kuehl.[8] It thus is not necessary to consider whether appellants have established the existence of unexpected properties for the reactions of the appealed claims since their invention has been shown to be unobvious without such a showing.

### Summary

The decision of the board affirming the rejection of claims 16, 17, and 19 under 35 U.S.C. §§ 103 and 251 is reversed.

Reversed.

8. It is also possible to look at the so-called "change in the law" here, which comes about from the case law overruling of case law, as merely a later recognition of the fact that the statute had been incorrectly interpreted. Taking this view, one can say the statutory law was always as we interpreted it in

MILLER, Judge (concurring).

Although I am in full accord with the result reached by the majority and with most of its opinion, I cannot agree with its oblique criticism of this court's statement in *Wesseler* that in *Byers* the court "ignored the *fact* that the new reissue statute broadened the term 'error' by not limiting it to 'error' that had arisen through 'inadvertence, accident or mistake.'"

In *Byers*, this court agreed with the board's decision, affirming the rejection of claims in a reissue application. The court said: "It is well settled that the deliberate withdrawal or amendment of a claim in order to obtain a patent does not involve inadvertence, accident or mistake and is not an error of the kind which will justify a reissue of the patent including the matter withdrawn."

In *Wesseler*, this court found that, while the appellant had acted "deliberately" in cancelling claims, this was "error without any deceptive intention." It reversed the board's decision affirming the rejection of claims in a reissue application.

Now the majority would revert to *Byers*, saying that the court was correct in its statement that:

The use of the word "error" . . . instead of the words "inadvertence, accident or mistake," which appeared in the corresponding section . . . of the patent statutes prior to the recodification of 1952, does not involve a substantive change, and the same type of error is necessary to justify a reissue after the enactment of the Patent Act of 1952 . . . .

It cites the Commentary by Federico which, discussing section 251, says:

There is no indication in the printed record that this change in language

*Kuehl*, but had merely been incorrectly applied for a time after In re Saunders. Looked at in this fashion, there really was no change in the law to be taken advantage of by reissue, and the "error" was in not recognizing that *Saunders* was wrong.

was intended to effect any change in substance and, since the old phrase was usually rather liberally construed, except when the reissue sought to recapture claims cancelled during the prosecution of the original patent, this question would be of minor significance except in connection with the situation mentioned.

However, the Commentary adds:

As to this situation there would be a large body of precedent to overcome, but one commentary urges that there is a liberalization in this respect.

Far more relevant to the determination of legislative intent are the Committee Reports of the House of Representatives and the Senate. These state that "there are a number of changes in substantive statutory law."[1] Giving substance to the changes in language made by section 251, as the court did in *Wesseler,* accords with this statement.

A fundamental principle of statutory interpretation is that a substantial change in language is evidence that a departure from the old law was intended. Johnson v. United States, 225 U.S. 405, 32 S.Ct. 748, 56 L.Ed. 1142 (1912). Here we have a change in the phrase "by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention," to "through error without any deceptive intention." The plain meaning of the new language is that reissue will be allowed for any error, deliberate or not, except where there is "deceptive intention"; whereas, the old language allowed reissue only where there was error consisting of "inadvertence, accident, or mistake," which had been interpreted by "a large body of precedent" *not* to include deliberate can-

cellation. *In re Byers,* supra. It may be, as the court in *St. Regis Paper Co.* put it, "difficult to imagine an 'error' which would not be encompassed by any of the terms "inadvertence, accident, or mistake'." However, "a large body of precedent" indicates that deliberate error (e.g. cancellation) was *not* encompassed by those terms. Congress is presumed to have had knowledge of the "large body of precedent." See Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L. Ed.2d 179 (1965). Thus there is ample basis for the presumption that Congress intended liberalization of the reissue statute. The majority opinion falls far short of rebutting that presumption.

Even assuming, arguendo, that no substantive change was intended, if the language is clear it is conclusive. "There can be no construction when there is nothing to construe." United States v. Hartwell, 73 U.S. (6 Wall.) 385, 396, 18 L.Ed. 830 (1868). Rules of interpretation are resorted to for the purpose of resolving an ambiguity, not for the purpose of creating it. Railroad Comm. of Wisconsin v. Chicago, B & Q R.R. Co., 257 U.S. 563, 589, 42 S.Ct. 232, 66 L.Ed. 371 (1922). This court should follow the plain meaning of the language "through error without any deceptive intention," unless the words are otherwise defined by the statute. If the Congress intended no change but, nevertheless, enacted one, it is for the Congress and not the courts to rectify its "deliberate mistake."

By interpreting "mistake" to include deliberate cancellation, the majority is saying, in effect, that the "well settled" principle referred to in *Byers* was wrong in the first instance. It over-

---

1. H.R.Rep.No. 1923, 82d Cong. 2d Sess. 5 (1952) ; S.Rep.No.1979, 82d Cong. 2d Sess. 4 (1952). The House Report (p. 8) and the Senate Report (p. 7) both state that sections 251 and 252 are a "development" of the present statute; that they "make a number of clarifications and a few additions in further development of the subject [of reissue]." The revision notes accompanying each report merely state that "some changes in language" appear in section 251 compared

to its predecessor, 35 U.S.C. § 64 (1946 ed.). However, changing the language to cover a patentee "claiming as his own invention or discovery more than he had a right to claim" to "claiming more *or less* than he had a right to claim" (emphasis supplied) obviously was a substantive change. So too the broader language "error without any deceptive intention" represents a substantive change.

comes the "large body of precedent" referred to by Federico—not by recognizing a substantive change enacted by Congress, but by renouncing this court's holding in *Byers* after a lapse of eighteen years.